# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:19-cv-00360-MR

| | |
|---|---|
| IN RE: | ) |
| | ) |
| SMOKY MOUNTAIN COUNTRY CLUB PROPERTY OWNERS' ASSOCIATION, INC. | ) ) ) ) |
| _____ | ) |
| | ) |
| RONNIE C. HEDGEPETH, JR., SHIRA HEDGEPETH, ROBERT L. YOUNG and MARY H. YOUNG, | ) ) ) |
| | ) |
| Appellants, | ) |
| | ) |
| vs. | ) |
| | ) |
| SMOKY MOUNTAIN COUNTRY CLUB PROPERTY OWNERS' ASSOCIATION, INC. and SMCC CLUBHOUSE, LLC, | ) ) ) |
| | ) |
| Appellees. | ) |
| _____ | ) |

## BRIEF OF APPELLANTS RONNIE C. HEDGEPETH, JR., SHIRA HEDGEPETH, ROBERT L. YOUNG AND MARY H. YOUNG

Shira Hedgepeth, Esq.
P.O. Box 514
Cullowhee, NC 28723
(828) 585-5044 (Telephone)
(828) 828-585-6097 (Fax)
shira@legal-decisions.com
Attorney for Appellants Hedgepeths

Robert L. Young and Mary H. Young, Pro Se
2907 Upper Park Rd.
Orlando, FL 32814
(407) 340-5149 (cell)
ryoung111@cfl.rr.com

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ……………………………………………. iv

JURISDICTIONAL STATEMENT ………………………………….. 1

STATEMENT OF THE ISSUES …………………………………….. 1

STANDARD OF APPELLATE REVIEW ………………………….. 2

REQUEST FOR ORAL ARGUMENT …………………………….. 2

STATEMENT OF THE CASE …………………………………….. 2

STATEMENT OF THE FACTS …………………………………….3

SUMMARY OF THE ARGUMENT ………………………………….. 10

 ARGUMENT

I. The bankruptcy court erred in confirming a Plan where the source of funding is based on the Association's assumption of a contract which had been terminated pre-petition. ………………………………………………… 12

II. The bankruptcy court erred in confirming a Plan proposed by self-interested parties which imposes on the Owners obligations to pay an alleged debt of the Association where there has not been a determination that the Owners have such a legal responsibility and where the effect of the Plan is to preempt the Owners' right to challenge the proposed assessments and defend against collection. ……………………………………………………. 19

III. The bankruptcy court erred in confirming a Plan where the Association agreed to assess Owners for a payment to SMCC Clubhouse without complying with the Special Assessment provisions of Article I, Section 30 of the Declaration. …………………………………………………….. 23

IV. The bankruptcy court erred in confirming a Plan which conflicts with prior state court rulings regarding the condominiums. ………………………… 27

Case 1:19-cv-00360-MR   Document 8   Filed 02/27/20   Page 2 of 72

CONCLUSION …………………………………………………… 30

CERTIFICATE OF SERVICE ……………………………………… 31

APPENDIX ………………………………………………………… 32

    Articles of Incorporation of Smoky Mountain Country Club
        Property Owners' Association, Inc. ………………………….. Ex. I

    By-Laws of Smoky Mountain Country Club Property Owners'
        Association, Inc. ………………………………………………… Ex. II

    Partial Judgment on Condominium Issue dated April 27, 2018,
        Swain County Superior Court, Case No. 14 CVS 238 ……….. Ex. III

# TABLE OF AUTHORITIES

**Cases**

*Conleys Creek Limited Partnership, et al. v. Smoky Mountain Country Club Property Owners' Association, Inc.*, 805 S.E. 147 (2017) ……… 7, 21, 27

*In re Coast Cities Truck Sales, Inc.*, 147 B.R. 674, 677 (D.N.J. 1992) ……11, 18

*In re General Datacomm Industries, Inc.*, 407 F.3d 616 (3rd Cir. 2005) ………14

*In re Idearc, Incorporated*, 662 F.3d 315 (5th Cir. 2011) ……………………….2

*In re J.A. Jones, Inc.*, 492 F.3d 242 (4th Cir. 2007) ……………………………..2

*In re Locke Mill Partners*, 178 B.R. 697, 700 (Bankr. M.D.N.C. 1995) ………12

*In re Raymond*, 129 B.R. 354, 357 (Bankr. S.D.N.Y. 1991) …………………..15

*In re Thompson*, 186 B.R. 301 (N.D. Ga. 1995) ………………………………….11

*In re Triangle Laboratories, Inc.*, 663 F.2d 463, 467 (3rd Cir. 1981) …..…....18

*In re Trigg*, 630 F.2d 1370 (10th Cir. 1980) ………………………………..11, 18

*In re Urban Broadcasting Corp.*, 401 F.3d 236, 244 (4th Cir. 2005) …………..3

*In the Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226 (Bankr. D.N.J. 2000) …………………………………………………13

*Midsouth Golf, Inc. v. Fairfield Harbourside Condominium Association, Inc.*, 652 S.E.2d 378 (2007) …………………………………………………..22

*Raintree Corp. v. Rowe*, 248 S.E2d 904 (1978) ……………………………….22

*Shores of Panama Resort Community Association, Inc. v. Shores of Panama, LLC*, 204 So.3d 547 (Fla. 1st DCA 2016) ……………………………………24

*U.S. Trustee v. Clark*, 927 F.2d 793, 795 (4th Cir. 1991) ………………………3

iv

**Statutes**

11 U.S.C. §365 ................................................................ 14

11 U.S.C. §365(a) ............................................................14

11 U.S.C. §365(b) ............................................................14

11 U.S.C. §1123(a)(5) .......................................................13

11 U.S.C. §1123(b)(2) .......................................................14

11 U.S.C. §1129 (a) ..........................................................12

11 U.S.C. §1129(a)(1) .......................................................12

11 U.S.C. §1129(a)(11) ....................................................13

28 U.S.C. §157(a) ..............................................................1

28 U.S.C. §157(b)(2)(A) & (L) ...........................................1

28 U.S.C. §158(a)(1) ..........................................................1

28 U.S.C. §1334(a) ..........................................................1

765 ILCS §605(18)(a)......................................................24

California Civil Code §1366..............................................24

Fla. Stat. §718.103(24).....................................................24

NCGS §47C-2-107(a)....................................................28

NCGS Chapter 47F........................................................16

NCGS §47F-2-102(a).....................................................24

NCGS §47F-3-102(2)......................................................25

NCGS §47F-3-103(c)......................................................25

NCGS §47F-3-105.....................................................16, 18

NCGS §55A-8-08(a).......................................................10

RCW 64.90.525.............................................................24

Uniform Planned Community Act (1980), 7A Uniform Laws Annotated
  81 (2017)...................................................................16

Case 1:19-cv-00360-MR   Document 8   Filed 02/27/20   Page 5 of 72

**Rules**

Fed. R. Bankr. P. 8003…………………………………………………………..1

**Other**

Comment to Section 3-105 of the Uniform Planned Community Act……….17

Patrick K. Hetrick, *Of "Private Governments" and the Regulation of Neighborhoods: The North Carolina Planned Community Act*, 22 Campbell Law Review 1, 63-64 (1999)……………………………16

Vern Countryman, *Executory Contracts in Bankruptcy, Part I*, 57 Minn. L. Rev. 439, 460 (1973)……………………………………………….14

House Report No. 95-595, 95th Cong., 1st Sess. 413 (1977)………………….13

Senate Report No. 95-989, 95th Cong., 2d Sess. 128 (1978)………………...13

Case 1:19-cv-00360-MR   Document 8   Filed 02/27/20   Page 6 of 72

# JURISDICTIONAL STATEMENT

The basis of the bankruptcy court's jurisdiction is 28 U.S.C. §1334(a) and 28 U.S.C. §157(a) and (b)(2)(A) and (L).

This Court has jurisdiction of this matter pursuant to 28 U.S.C. §158(a)(1) and Fed. R. Bankr. P. 8003.

The bankruptcy court entered the Order Confirming Plan of Reorganization of Smoky Mountain Country Club Property Owners' Association, Inc. and Creditor SMCC Clubhouse, LLC ("Confirmation Order") **[Doc. 260]** on December 19, 2019. Appellants timely filed their Notice of Appeal **[Doc. 279]** on December 31, 2019.

This appeal is from a final order of the bankruptcy court.

# STATEMENT OF THE ISSUES

**I. Whether the bankruptcy court erred in confirming a Plan where the source of funding is based on the Association's assumption of a contract which had been terminated pre-petition?**

**II. Whether the bankruptcy court erred in confirming a Plan proposed by self-interested parties which imposes on the Owners obligations to pay an alleged debt of the Association where there has not been a determination that the Owners have such a legal responsibility and where the effect of the Plan is to preempt the Owners' right to challenge the proposed assessments and defend against collection?**

**III. Whether the bankruptcy court erred in confirming a Plan where the Association agreed to assess Owners for a payment to SMCC Clubhouse without complying with the Special Assessment provisions of Article I, Section 30 of the Declaration?**

1

**IV. Whether the bankruptcy court erred in confirming a Plan which conflicts with prior state court rulings regarding the condominiums?**

## <u>STANDARD OF APPELLATE REVIEW</u>

This court sitting as an appellate court reviewing a final order of the bankruptcy court reviews the bankruptcy court's legal conclusions de novo while accepting the bankruptcy court's factual findings unless they are clearly erroneous. *In re J.A. Jones, Inc.,* 492 F.3d 242 (4th Cir. 2007). In determining whether to reverse an order confirming a plan of reorganization, a court should interpret the terms of the plan and the confirmation order de novo and holistically. *In re Idearc, Incorporated*, 662 F.3d 315 (5th Cir. 2011).

## <u>REQUEST FOR ORAL ARGUMENT</u>

This case has a complicated factual history and raises several complicated legal issues. Accordingly, oral argument would be beneficial to the Court.

## <u>STATEMENT OF THE CASE</u>

This appeal is from the Confirmation Order entered by the bankruptcy court after a December 17, 2019 confirmation hearing on the Plan of Reorganization ("Plan") **[Doc. 96]** filed jointly by Debtor, Smoky Mountain Country Club Property Owners' Association, Inc. ("Association") and creditor SMCC Clubhouse, LLC ("SMCC Clubhouse"). Numerous objections to confirmation of the Plan were filed

2

including the Amended Objection to Chapter 11 Plan filed by Appellants Hedgepeth **[Doc. 216]** and the Objection to Confirmation filed by Appellants Young **[Doc. 207]**.

Appellants are persons aggrieved by the Confirmation Order and, therefore, have standing to file this appeal. See *US Trustee v. Clark*, 927 F2d 793, 795 (4th Cir 1991) and *In re Urban Broadcasting Corp*., 401 F3d 236, 244 (4th Cir 2005). Appellants are property owners in the Smoky Mountain Country Club development; members of the Association, a North Carolina nonprofit corporation; and parties obligated under the Plan to pay past and future Clubhouse Dues. See Plan, Article IV, Section 4.4.1 and Section 4.4.2. Appellants are also obligated under Article IV, Section 4.4.3 of the Plan to pay a pro rata share on a judgment held by SMCC Clubhouse, which is currently on appeal to the North Carolina Court of Appeals.

## **STATEMENT OF FACTS**

### Establishment of Development

Smoky Mountain Country Club ("SMCC") is a residential planned community in Whittier, Swain County, North Carolina, governed by (1) an Amended and Restated Declaration of Covenants, Conditions and Restrictions and Reservations of Easements dated October 15, 1999 and recorded on November 23, 1999 in Book 229, Page 919, Swain County, North Carolina Official Records ("Declaration") **[Doc. 304, Ex. 1]** and (2) the North Carolina Planned Community Act, NCGS Chapter 47F. Conleys Creek Limited Partnership ("CCLP") is the

3

developer of SMCC and the Declarant under the Declaration, which was drafted by Marshall Cornblum. **[Doc. 283, p.22, lines 13-14]** The Association is the nonprofit corporation designated under the Declaration to operate and manage SMCC (Declaration, Article III) and is the Debtor herein. There was no Association at the time the Declaration was adopted. **[Doc. 283, p.73, lines 7-12]** The Association was formed on October 29, 1999 and registered with the North Carolina Secretary of State on November 30, 1999. **[Appendix Ex. I]**

Clubhouse

Pursuant to Article II, Section 4 of the Declaration titled "General Plan of Development" "Clubhouse, Swimming Pool and Tennis Center", in June 2002 CCLP completed construction on land owned by it of a two-story 5000+ square foot clubhouse ("Clubhouse") together with a swimming pool and 2 tennis courts **[Doc. 283, p.27, lines 21-22]** which CCLP owned, managed and operated. (Declaration, Recitals, paragraph E.4 and Article I, Section 4) SMCC Clubhouse is the current owner of the Clubhouse pursuant to a transfer to it from CCLP in 2013. **[Doc. 235, p.3]** Both CCLP and Clubhouse are controlled by Michael Cornblum and his father, Marshall Cornblum (hereinafter either individually or collectively the "Cornblums"). **[Doc. 283, p.16, lines 5-7 and 13-18]**

On the Clubhouse lower level there were men's and women's locker rooms and exercise facilities. On the upper level there were originally a restaurant and

4

community meeting rooms. In 2007 the Clubhouse caught fire and the upper level burned down. As of this date, over 12 years after the fire, CCLP has not rebuilt or replaced the upper level. **[Doc. 283, p.65, lines 6-15 and 23-24]**

CCLP granted the Association and the Property Owners "a perpetual nonexclusive right to use" the lower level of the Clubhouse and the swimming pool and tennis courts (referred to as the "Clubhouse Use Facilities") in exchange for each Property Owner paying "Clubhouse Dues" to the Association, which in turn would turn over those monies to CCLP. (Declaration, Article I, Section 3) The amount of the Clubhouse Dues was fixed in the Declaration for fifty years until 2049 subject to potential automatic extensions of ten year terms. (Declaration Article X, Section 6) **[Doc. 283, p.18, lines 2-8; p.67, lines 9-10]**

Not only did the Association have no control over determining what the Clubhouse Dues assessment amount would be **[Doc. 283, p.22, lines 5-7]**, neither the Association nor the Property Owners had any ownership, control or management rights in any part of the Clubhouse. The Declaration provided in Article II, Section 4 that use of the lower level would be subject to "the rules and regulations, scheduling, and the seasonal days and daily hours of operation established from time to time by Declarant". If a Property Owner were delinquent in paying the Clubhouse Dues or the Association were delinquent in billing, collecting and paying the

5

Clubhouse Dues to CCLP, a Property Owner's use of the lower level could be suspended by CCLP. (Declaration, Article II, Section 4)

CCLP also had "the absolute right to allow members of the public, other than the Association and the Owners" to use the lower level of the Clubhouse "on such terms and conditions, and to charge such fees, as determined from time to time by Declarant." In addition, "guests, invitees and lessees" of each Property Owner had the nonexclusive right to use the lower level "upon payment to Declarant of a use charge established from time to time by Declarant." (Declaration, Article II, Section 4) Each Property Owner was also obligated to pay for (1) all food, beverages, sundries and merchandise sold at the Clubhouse and (2) events and activities at the Clubhouse in which such owner participated. (Declaration, Article II, Section 4)

<u>May 2014 Annual Membership Meeting</u>

At the Association's annual membership meeting in May 2014, the Property Owners elected an independent board not controlled by CCLP. Thereupon, the newly-elected board hired independent legal counsel to advise it on certain matters. Based on an opinion from legal counsel, in September 2014 the board advised CCLP and the Property Owners that it would no longer assess, bill and collect for Clubhouse Dues. The board also advised each Property Owner to contract with CCLP directly if the owner wished to use the Clubhouse Use Facilities in the ½ burned down building since the Association had no ownership in those facilities or

control over them. Some owners chose to continue to use and pay CCLP directly; others chose not to use the facilities. **[Doc. 235 p. 16; Doc, 283, p.28, line 23 – p.30, line 14 and p.31, lines 17-19]**

## State Court Suit

In October 2014, CCLP sued the Association and various board members in Swain County Superior Court, for among other things, an alleged breach of contract for the Association's decision to no longer assess, bill and collect for the Clubhouse Dues. The original trial court judge granted the Association summary judgment on the Clubhouse Dues issue. **[Doc. 283, p.33, line 25 - p.34, line 2]** CCLP then appealed to the North Carolina Court of Appeals.

## Court of Appeals Opinion

The Court of Appeals issued its final opinion on September 5, 2017. See *Conleys Creek Limited Partnership, et al. v. Smoky Mountain Country Club Property Owners' Association, Inc.*, 805 S.E.2d 147 (2017). Among other things, the Court of Appeals reversed the trial court's granting of summary judgment to the Association on CCLP's breach of contract claim and remanded the case to the trial court for a trial on that issue. *Id.* at 158.

## Trial and Judgment

On remand, a new judge was assigned to hear the case, which was tried in May 2019. It resulted in a jury verdict after the trial judge inexplicably struck the

Association's defenses. **[Doc. 207, Ex. 1; Doc. 283, p.7, lines 7-10]** The trial court also failed to understand basic principles of contract law with regard to executory contracts. Accordingly, SMCC Clubhouse was allowed to present evidence and argue that because the Association failed to continue to bill the Property Owners for Clubhouse Dues from the fall of 2014 forward, the Association was **personally** indebted to SMCC Clubhouse for Clubhouse Dues owing until 2049, reduced to present value, plus pre-judgment interest thereon. **[Doc. 283, p.35, lines 2-16 and 21; p.77, line 17 – p.78, line 12]** This resulted in an adverse jury verdict against the Association, even though under the Declaration, any alleged obligation to pay Clubhouse Dues was the Property Owners', not the Association's **[Doc. 283, p.66, lines 21-22 and p.71, line 23 – p.72, line4]**; amounts allegedly owed by Property Owners were incurred monthly and not due until billed; and, the Clubhouse Dues provision had been terminated by the Board's March 2019 Resolution **[Doc. 217, Ex.1]**. In addition, SMCC Clubhouse was not required to credit against the alleged indebtedness the monies it had collected directly from Property Owners from fall 2014 through the trial date. **[Doc. 283, p.78, lines 9-12]**

As a result, after a jury verdict for SMCC Clubhouse, the trial judge entered a judgment against the Association for $8,992,186.98 (hereinafter "Judgment"). **[Doc. 304, Ex. 2]**

8

In May 2019, subsequent to the entry of the jury verdict, the Association held its annual meeting including election of a new board for 2019-2020. Four members of the 2018-2019 board were over-whelmingly elected again together with a new board member. These candidates all defeated four other nominees who had been recruited and supported by the Cornblums. **[Doc. 283, p.62, lines 14-17]**

### Post-Annual Membership Meeting Events

Subsequent to the 2019 annual meeting, the trial judge entered the Judgment. The board, after consultation with its trial counsel, filed an appeal with the North Carolina Court of Appeals. However, armed with the Judgment, SMCC Clubhouse obtained writs of execution and sent the Sheriff to levy on the Association's bank accounts. **[Doc. 235, p.4, ¶10]** In addition, the Cornblums led an effort to recall the 4 board members who had just been elected by the Property Owners and replace them with the 4 candidates they had recruited to run at the annual meeting, but who had lost. **[Doc. 283, p.62, line 14 – p.64, line 8]** Because of all the foregoing events plus additional claims which had been made against it, the Association filed for Chapter 11 on July 26, 2019. **[Doc. 1]**

### Recall Election

After the Chapter 11 was filed, the Association sought direction from the bankruptcy judge regarding a recall petition spearheaded by the Cornblums which

9

had been filed pre-petition pursuant to NCGS §55A-8-08(a) to remove without cause four of the five recently elected board member. **[Doc. 235, p. 5, ¶12]** The bankruptcy judge entered an order approving the holding of a recall election. **[Doc. 71]** The recall election was held on September 24, 2019 whereupon the 4 board members who had been elected overwhelmingly in May 2019 were voted out and the 4 candidates recruited and supported by the Cornblums were voted in as directors. This resulted from a recall majority of 1 vote cast out of approximately 179 ballots (20 of which were cast by the Cornblums) after the Cornblums stated that they would not negotiate with the board elected at the May 2019 general membership meeting, but would only negotiate with the persons they had recruited to replace them ("Replacement Board"). **[Doc. p.38, lines 13-17; p.61, line 22; and p.62, line 14 – p.63, line 5]**

Thereafter, within 3 weeks after taking over, the Replacement Board announced it had negotiated a resolution with the Cornblums which resulted in the filing of the Plan.

<u>SUMMARY OF THE ARGUMENT</u>

The Plan proposes to deal with the Association's financial issues by requiring the Property Owners to fund the Plan. The Plan requires that all Property Owners, including Appellants, pay any "past due" Clubhouse Dues accrued since October 2014; pay "future" Clubhouse Dues from and after January 1, 2020; and pay a pro

10

rata share of a $1,500,000 payment agreed on between SMCC Clubhouse and the Association through the Replacement Board. See Articles 4.4.1, 4.4.2 and 4.4.3 of the Plan **[Doc. 96].** To implement these payments, the Plan provides in Article 8.5 that the Association will assume, reinstate and reaffirm the Declaration including all provisions regarding Clubhouse Dues.

However, as a matter of law a bankruptcy court cannot confirm a plan where the funding for it is based on the assumption and reinstatement of a terminated agreement. See, e.g., *In re Thompson*, 186 B.R. 301 (Bankr. ND Ga. 1995); *In re Coast Cities Truck Sales, Inc.*, 147 B.R. 674 (D.N.J. 1992); and *In re Trigg*, 630 F.2d 1370 (10th Cir. 1980). The Association's alleged duty to assess, bill and collect Clubhouse Dues was terminated by the Board's March 26, 2019 Resolution. **[Doc. 217, Ex. 1]**

The bankruptcy court further erred in confirming a Plan which imposes payment obligations on the Property Owners to pay an alleged debt of the Association where there has been no prior determination that the Property Owners have such a legal responsibility and where the effect of the Plan is to preempt the Property Owners' rights to challenge the proposed assessments and defend against collection.

In addition, as a matter of law the bankruptcy court cannot confirm the Plan where the funding for the $1,500,000 payment has not been approved by the

Property Owners pursuant to the Special Assessment provisions of Article I, Section 30 of the Declaration.

Finally, the bankruptcy court erred in confirming a Plan which conflicts with prior rulings in this case by the North Carolina Court of Appeals and the Swain County Superior Court that the condominium common elements belong to the condominium owners and should not have been titled in the name of the Association.

## ARGUMENT

This case is the result of a "rush to judgment" to appease a **for profit** developer, rather than to develop a comprehensible solution for the financial affairs of a **nonprofit** debtor. As a result the Plan does not provide adequate means for its implementation nor offer a result consistent with the goals of the Bankruptcy Code.

**I. The bankruptcy court erred in confirming a Plan where the source of funding is based on the Association's assumption of a contract which had been terminated pre-petition.**

11 U.S.C. §1129(a) of the Bankruptcy Code deals with the confirmation of Chapter 11 plans. It provides that the "court shall confirm a plan only if all of the following requirements are met." The burden is on the plan proponent to establish by a preponderance of the evidence that each of the requirements has been met. See *In re Locke Mill Partners*, 178 B.R. 697, 700 (Bankr. M.D.N.C. 1995).

11 U.S.C. §1129(a)(1) states that a plan must comply with the applicable

12

provisions of title 11. 11 U.S.C. §1123(a)(5) requires that a plan must "provide adequate means for the plan's implementation". At the confirmation hearing, the bankruptcy court must determine pursuant to the requirements of 11 U.S.C. §1129(a)(11) that the "plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." This is commonly referred to as the "feasibility test". See House Report No. 95-595, 95th Cong., 1st Sess. 413 (1977) and Senate Report No. 95-989, 95th Cong., 2d Sess. 128 (1978). The plan proponent has the burden to establish feasibility by presenting evidence that the plan has a reasonable chance of succeeding. *In the Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226 (Bankr. D.N.J. 2000). This is typically done by demonstrating there is sufficient cash flow to fund the plan. The Association failed to do that in this case and, therefore, the bankruptcy court erred in confirming the Plan.

In this case, the major funding source of the Plan is monies to be collected from the Property Owners, including Appellants, pursuant to the following Plan provisions:

> As set forth in Section 8.5 below, the Debtor and Reorganized Debtor **assume, reinstate and reaffirm** all obligations under the Clubhouse Dues provisions in the Declaration. Section 4.4.1.

> Each owner who has not paid any Clubhouse Dues to SMCC Clubhouse on or after October 1, 2014 shall be billed by SMCC Clubhouse … the amount of Clubhouse Dues owed …. Section 4.4.1.a.

13

As set forth in Section 8.5 below, the Debtor and Reorganized Debtor **assume, reinstate and reaffirm** all obligations under the Clubhouse Dues provisions in the Declaration in the same manner as if there had been no breach thereof by the Debtor and the Debtor and Reorganized Debtor agree to fully perform all obligations under the Declaration to assess, bill and collect Clubhouse Dues becoming due and owing on or after January 1, 2020 from the Owners …." Section 4.4.2.

Reaffirmation of Declaration. Upon Confirmation, the Debtor and Reorganized Debtor shall, and shall be deemed to have, **assumed, reinstated and reaffirmed** the Declaration, including, without limitation, all provisions related to the Clubhouse Dues …. Section 8.5. **[Doc. 96, pp. 19 & 26]**

Thus, the feasibility of the Plan rises or falls on whether the provisions in the Declaration regarding the Association's duty to assess, bill and collect Clubhouse Dues from the Property Owners can be assumed, reaffirmed and reinstated by the Association pursuant to 11 U.S.C. §365 and 11 U.S.C. §1123(b)(2).

A debtor can only assume a contract that is executory as of the petition date (11 U.S.C. §365(a)) and must, at the time of the assumption, comply with the requirements of 11 U.S.C. §365(b), which include providing "adequate assurance of future performance". An executory contract is one in which, as stated by Professor Countryman, (1) there are obligations on both sides and (2) the nature of those obligations is such that non-performance of either would constitute a material breach of the underlying contract. See Vern Countryman, *Executory Contracts in Bankruptcy, Part I,* 57 Minn. L. Rev. 439, 460 (1973); *In re General Datacomm*

14

*Industries, Inc.,* 407 F.3d 616 (3rd Cir. 2005); *In re Raymond*, 129 B.R. 354, 357 (Bankr. S.D.N.Y. 1991).

The Clubhouse Dues provisions in the Declaration are an executory contract drafted and placed in the Declaration by Marshall Cornblum in October 1999 prior to the Association's formation by the Cornblums. There were no arms-length negotiations between two unrelated parties regarding the Clubhouse or the Clubhouse Dues provisions. Upon CCLP's construction of a 5000+ square foot clubhouse, swimming pool and 2 tennis courts, on property owned by it, the Association and Property Owners received a "perpetual nonexclusive right to use" (i.e. a license) the facilities owned, managed, operated and controlled by CCLP. CCLP was obligated to operate and maintain those facilities until at least 2049. In exchange, the Association was obligated to bill and collect Clubhouse Dues from the Property Owners and turn them over to CCLP. Of significance, the Association was not obligated to pay CCLP from its general assets nor did it guarantee the payment of the Clubhouse Dues. If the Association received monies from the Property Owners, it was obligated to remit them to CCLP. It was, in effect, a bill collector for CCLP. It did not own, operate, manage or control in any way the Clubhouse.

The executory nature of the Clubhouse Dues provisions in the Declaration is acknowledged by the Association in Plan Sections 4.4.1, 4.4.2 and 8.5 quoted above

15

where the Association provides that it is "assuming, reinstating and reaffirming" the Clubhouse Dues provisions. However, as of the Petition Date, there was nothing to assume. The executory contract had been terminated prepetition.

Attached as Exhibit 1 to Appellants' Objection **[Doc. 217, Ex. 1]** is a copy of the Resolution of the Association's Board dated March 26, 2019. This Resolution was adopted pursuant to the authority of NCGS §47F-3-105 which states:

> **Termination of contracts and leases of declarant.** If entered into before the executive board elected by the lot owners pursuant to G.S. 47F-3-103(e) takes office, any contract or lease related to the planned community that is not bona fide or was unconscionable to the lot owners at the time entered into under the circumstances then prevailing, may be terminated without penalty by the association **at any time** after the executive board elected by the lot owners pursuant to G.S. 47F-3-103(e) takes office upon not less that 90 days' notice to the other party. (Emphasis added)

This statute is part of the North Carolina Planned Community Act, NCGS Chapter 47F, enacted in 1998 and applicable to planned communities created on or after January 1, 1999. The Act was modeled after the Uniform Planned Community Act adopted in 1980 by the National Conference of Commissioners on Uniform State Laws. See Uniform Planned Community Act (1980), 7A Uniform Laws Annotated 81 (2017).

NCGS §47F-3-105 does not adopt the exact language of Section 3-105 of the Uniform Act. See Patrick K. Hetrick, *Of "Private Governments" and the Regulation of Neighborhoods: The North Carolina Planned Community Act*, 22 Campbell Law

16

Review 1, 63-64 (1999). However, Comment 1 to Section 3-105 of the Uniform Act is instructive in stating the purpose of that provision:

> This section deals with a common problem in the development of condominium and planned community projects: the temptation on the part of the developer, while in control of the association, to enter into, on behalf of the association, **long-term contracts** and leases **with himself or with an affiliated entity.** (Emphasis added)

This is exactly what occurred in this case and led to the adoption of the Board's Resolution. Per the Resolution, the Board specifically determined that the Board had a fiduciary duty to its members to enter into contracts only if they (1) benefited the Association and its members; (2) were economically fair and equitable to the Association and its members; and (3) could be monitored by the Board to ensure compliance by the provider and quality of the services being delivered. The Board further concluded that the Clubhouse Dues provision was a long-term non-amendable contract entered into in 1999 when the Cornblums controlled both the Declarant CCLP and the Association; was for a minimum term of 50 years; and did not provide the Association with the ability to monitor performance and renegotiate its terms. In addition, the contract exposed the Association to potential liability under both North Carolina and federal fair debt collection practices laws in its role as an unpaid collection agent for Clubhouse Dues for a "perpetual nonexclusive right to use" a property which the Association did not own, operate, manage or control and

which was also available to non-residents of the Development upon Clubhouse's sole determination.

The Board also examined the "profit" margin which CCLP had negotiated for itself and found it to be unconscionable. Unlike other annual assessments which the Board made under the authority of the Association's governing documents after the membership's ratification of the Association's annual budget, the Board had no input into the annual amount to be assessed for Clubhouse Dues. That had already been fixed in the Declaration drafted by Marshall Cornblum in 1999.

Accordingly, the Board found that the collection obligation was both not bona fide and unconscionable for the numerous reasons set forth therein, and terminated the Clubhouse Dues contract pursuant to NCGS §47F-3-105.

The law is clear that a debtor cannot reinstate a terminated contract. See *In re Coast Cities Truck Sales, Inc.*, 147 B.R. 674, 677 (D.N.J. 1992) ("executory contracts cannot be assumed pursuant to §365 if they are validly terminated prior to a debtor's filing of a bankruptcy petition"); *In re Triangle Laboratories, Inc.,* 663 F.2d 463, 467 (3rd Cir. 1981) ("[F]or section 365 to apply, the contract … must be in existence. If the contract … has been terminated prior to the commencement of the bankruptcy case, there is nothing left for the trustee to assume …."); and *In re Trigg*, 630 F.2d 1370 (10th Cir. 1980).    That which is dead cannot be revived pursuant to 11 U.S.C. §365.

Although the Appellants argued that the Plan could not be confirmed as a result of the Resolution which terminated the Clubhouse Dues contract prepetition, the Association presented no evidence nor made any legal argument at the confirmation hearing proving that the Clubhouse Dues provision had not been terminated or that established that the Association had a legal right to revive an agreement which had been terminated pre-petition. Nevertheless, the Bankruptcy Court erroneously ruled to confirm the Plan and to allow the Association to "assume, reinstate and reaffirm" the terminated agreement.

Without a legitimate basis to bill and collect Clubhouse Dues from the Property Owners, the Association's Plan cannot be implemented and is not feasible.

**II. The bankruptcy court erred in confirming a Plan proposed by self-interested parties which imposes on the Owners obligations to pay an alleged debt of the Association where there has not been a determination that the Owners have such a legal responsibility and where the effect of the Plan is to preempt the Owners' right to challenge the proposed assessments and defend against collection.**

The over-arching purpose of the Plan is to deal with the Judgment against the Association presently on appeal to the North Carolina Court of Appeals.

The Judgment **[Doc. 304, Ex. 2]** consists of two components. The first component was calculated by adding all Clubhouse Dues allegedly due to be assessed, collected and remitted to Clubhouse by the Association from October 2014 through the trial date in May 2019 without any deduction of the monies which had been paid directly to Clubhouse by residents who had chosen to use and pay for the

19

facilities. The second component was calculated by adding all Clubhouse Dues which would be hypothetically due in the future from the May 2019 trial date through 2049, the initial term of the Declaration, without any deduction for monies which Clubhouse would receive in the future from Owners who would continue to use and pay for the facilities. Neither was there any consideration that one cannot collect under an executory contract for monies not yet due and owing. See Argument I above. Nor was there any consideration of the fact that the makeup of the membership in the future will change as residents sell to new owners or pass away with a resultant transfer of ownership via a decedent's estate. Rather, the impact of the trial court's erroneous judgment is that the constituents of the current Association were responsible for the obligations of unknown persons who would become a part of the Association in the future.

Post-judgment the trial court not only failed to correct the Judgment, but added interest covering the time period from October 2014 thru 2049 even though you can neither legally assess interest on monies not yet due nor on monies which have already been timely paid to you. This, among other reasons, is why the Board appealed the Judgment.

The Replacement Board, however, in a rush to appease the Cornblums who got them elected to the Board, ignored in the Plan prior rulings of North Carolina courts in this case. The Swain County Superior Court initially entered a summary

20

judgment in the Association's favor on the Clubhouse Dues issue denying SMCC Clubhouse's claim against the Association. Clubhouse appealed to the North Carolina Court of Appeals which issued its opinion. See *Conleys Creek Limited Partnership, et al. v. Smoky Mountain Country Club Property Owners Association, Inc., et al.*, 805 S.E.2d 147 (2017).

In its decision, the Court of Appeals held that the SMCC Clubhouse had met its burden to survive summary judgment, reversed the trial court's order granting the Association summary judgment on the Clubhouse Dues issue and remanded the case to the trial court for further proceedings consistent with its opinion. *Id.* at 158. The Court of Appeals further noted that "the Developer has not sued the homeowners themselves to enforce any covenant" and that "the homeowners are not parties" to the suit. *Id.* at 155. Accordingly, the Court of Appeals stated that it was making "no ruling regarding the obligation of the homeowners themselves to pay Clubhouse Dues to the Association, as they are not parties to this action." *Id.* at 155. The court then makes a gratuitous comment noting that "homeowners within a planned community are generally obligated to respect not only real covenants governing their property, but also to pay any dues which are assessed by their association." *Id.* at 155. This last comment is pure dicta and was not a ruling based on facts and legal issues before it. There has never been a court ruling on whether the Property Owners are required to pay Clubhouse Dues.

21

No court has ruled on whether a Property Owner is obligated to pay Clubhouse Dues. **[Doc. 283, p.59, line 25 – p.60, lines 6 & 19]** Because the issue of Property Owners' liabilities was not before it, the Court of Appeals did not consider the impact of cases such as *Midsouth Golf. Inc. v. Fairfield Harbourside Condominium Association, Inc.,* 652 S.E.2d 378 (2007) on the responsibility of homeowners to pay "recreational amenities" fees assessed pursuant to a declaration. At its core, the *Midsouth Golf* court analyzed whether the "recreational fee" provision was a real or personal covenant as to the homeowners. It concluded that it was a personal covenant because (1) the declaration only gave the property owners a license to use the "recreational facilities" not owned by the association, but by a successor to the developer; (2) they were required to pay whether they used the facilities or not; and (3) the "recreational amenities" were open to members of the public who did not own property in the development, citing *Raintree Corp. v. Rowe,* 248 S.E.2d 904 (1978). This looks like the facts of the present case.

Rather than acknowledging that there has never been a ruling regarding whether the Property Owners are legally obligated to pay Clubhouse Dues, the Plan assumes that all Property Owners are legally obligated to pay and appears to preempt any ability to challenge such an assessment. See Plan, Article IV, Section 4.4.1 and 4.4.2. **[Doc. 96, p. 19]**

The Plan fails to acknowledge that any Property Owner has the right, which cannot be taken away by an agreement between the Replacement Board and SMCC Clubhouse, to challenge any assessment. For example, a Property Owner who chooses not to use the facilities in the future would have the right to assert grounds for non-payment including, but not limited to, (1) improper attempt to enforce a personal covenant not binding on the Owner; (2) the North Carolina and Federal Fair Debt Collection Practices Acts; (3) failure of consideration; (4) antitrust law and (5) the Board's Resolution terminating the Clubhouse Dues contract. A successful challenge would result in all the funds contemplated to be received in the future and paid by the Association to SMCC Clubhouse under the Plan not being made.

Accordingly, the Plan is not feasible and the Bankruptcy Court erred in confirming it.

**III. The bankruptcy court erred in confirming a Plan where the Association agreed to assess Owners for a payment to SMCC Clubhouse without complying with the Special Assessment provisions of Article I, Section 30 of the Declaration.**

Section 4.4.2 of the Plan provides:

> The Debtor shall **automatically** assess the $1,500,000 to be paid to SMCC Clubhouse under this section against each of the 163 Owners who owned a Lot, Townhouse Unit or Condominium Unit on May 31, 2019 in the pro rata amount of $9,200.00 ….

Article I, Section 30 of the Declaration states:

23

> "Special Assessments" shall mean and refer to the amounts
> assessed by the Association to Owners (excluding Declarant) of
> Lots, Townhouses and Condominium Units for … a special
> need, for the common benefit of the Owners of Lots,
> Townhouse Units and Condominium Units …. Each of the
> Special Assessments shall be proposed by the board of directors
> of the Association, and shall become effective when adopted by
> the vote of … (2) at least 80% of votes entitled to be cast by
> only Class "A" members of the Association if the total
> assessment is $50,000 or more.

This provision was also cited by the Association in its Global Notes, paragraph 18.

**[Doc. 65]**

Although other states have specifically defined "special assessments" (see, e.g. Fla. Stat. §718.103(24) – "any assessment levied against a unit owner other than the assessment required by a budget adopted annually" and *Shores of Panama Resort Community Association, Inc. v. Shores of Panama, LLC,* 204 So.3d 547 (Fla. 1st DCA 2016)) or distinguished between regular assessments and special assessments, (see, e.g. Washington - RCW 64.90.525; California – Civ. Code §1366; and Illinois – 765 ILCS §605(18)(a)), the term "Special Assessments" is not defined nor does it appear in the North Carolina Planned Community Act or the North Carolina Condominium Act.

However, the Planned Community Act provides:

> To the extent not inconsistent with the provisions of this
> Chapter, the declaration … form[s] the basis for the legal
> authority for the planned community to act as provided in the
> declaration …. NCGS 47F-2-102(a).

24

Accordingly, the term "Special Assessments" should be interpreted according to its plain meaning and consistent with the other provisions of the Association's governing documents.

The term "Special Assessments" in the Declaration obviously refers to monies collected by the Association so that it can pay for expenses not included in the Association's annual budget. This conclusion can be gleaned from an analysis of relevant provisions of the Association's governing documents and related North Carolina law.

NCGS §47F-3-102(2) grants an association's board the power to adopt an annual budget. The Association's Treasurer has the duty to prepare the annual budget which is to be presented to the membership. By-Laws Section 7.9. **[Appendix Ex. II]** Thereafter, the Association's board must schedule a meeting for the membership to consider and vote on the proposed budget. NCGS §47F-3-103(c). Upon adoption by the membership, the Association's board has the duty to "fix the amount of the assessments against" the owners in order to fund the approved budget. Declaration, Article IV, Section 5. **[Doc. 304, Ex. 1]**

Article IV of the Declaration, entitled ASSESSMENTS, provides in Section 2 thereof the power and authority of the Association to levy the type of assessments enumerated thereafter. These are (1) Clubhouse Dues, (2) Maintenance Assessments, (3) Repair Assessments, (4) Townhouse Repair Assessments, (5)

Condominium Assessments and (6) Special Assessments. There is no other category of assessments authorized under the Declaration. Accordingly, the assessment set forth in Section 4.4.2 of the Plan must fit within one of these categories.

Categories (1) through (5) are assessments contemplated to be assessed and collected in the ordinary course of the Association's business and paid from the common fund collected by the Association in order to comply with the annual budget obligations approved by the membership. See Declaration, Article IV, Sections 4 & 5. Any "Special Assessment" requires an extraordinary action by the Association. Clearly, the Section 4.4.2 assessment is not for any of items (1) through (5) listed above. Thus, it must be category (6) which is governed by Declaration, Article I, Section 30 cited above.

The Association presented no evidence at the Confirmation Hearing that it had complied with the requirements of Article I, Section 30 of the Declaration. Analogous to the members' right to consider and vote on the annual budget which determines the amount of the regular assessments to be assessed against the members, the members have the right to consider and vote on any special assessment. This did not occur.

One factor which members may have considered if the proposed "special assessment" had been presented to them pursuant to the procedure set forth in the Declaration would have been the legitimacy and fairness of an extraordinary charge

26

assessed each property owner of record as of May 31, 2019 irrespective of when a Property Owner purchased property or whether a Property Owner had voluntarily paid Clubhouse Dues after October 1, 2014. In effect, Section 4.4.2 allows the Association to assess and collect the equivalent of Clubhouse Dues from some Property Owners who have already paid Clubhouse Dues directly to SMCC Clubhouse after October 2014. This is double-dipping, unfair and detrimental to those Property Owners who had been paying Clubhouse Dues.

This is another example of the Replacement Board's rush to judgment to appease the Cornblums. The Plan proposed by SMCC Clubhouse, controlled by the Cornblums, and the Replacement Board which was elected post-petition in September 2019 by the efforts of the Cornblums after ousting the board duly-elected by the membership at its May 2019 annual meeting, ignores the rights of the membership as discussed above.

Accordingly, to the extent that funding of the Plan is dependent on the legitimacy of Section 4.4.2 thereof, the Plan fails because it is not feasible. The Bankruptcy Court erred in confirming the Plan.

**IV. The bankruptcy court erred in confirming a Plan which conflicts with prior state court rulings regarding the condominiums.**

It its opinion at 805 S.E.2d 147, the North Carolina Court of Appeals held that:

27

[T]he Association is entitled to an order declaring that the 1999 Declaration establishes a form of property ownership in the Planned Community's condo units not recognized in North Carolina. *Id.* at 151.

Subsequently, the Swain County Superior Court entered a judgment on remand in favor of the Association. **[Appendix Ex. III]**

Per Article II, Section 7 of the Declaration, title to the condominium common elements was incorrectly vested in the Association – "Upon sale of the first Condominium Unit in a Condominium Building, Declarant shall convey the Condominium Common Element to the Association …" - rather than in the condominium owners as required by NCGS §47C-2-107(a) – "The declaration shall allocate a fraction or percentage of undivided interests in the (condominium) common elements … to each (condominium) unit …." As of the petition date, CCLP and the Association had not filed corrected documents in the public records necessary to effectuate the Court of Appeals' decision and comply with NCGS §47C-2-107(a). See Global Notes Regarding Debtor's Schedules of Assets And Liabilities And Statement of Financial Affairs, paragraph 16 **[Doc. 65]** and Declaration, Statement of Affairs, etc., paragraph 75 **[Doc. 63]**.

As a result, on the date of the Confirmation Hearing the Association improperly held title to the condominium common elements and SMCC Clubhouse held an improper lien on the condominium common elements per the Judgment. Under the Plan, this improper judgment lien will not be released until payments are

28

made. However, there is a conflict in the Confirmation Order **[Doc. 260]** as to when this is to occur.

Confirmation Order, paragraph 3(b) states:

> When SMCC Clubhouse has been paid all amounts due under Section 4.4.1, above, it shall execute and record a release of the Judgment Lien on the Condominium Common Element.

However, Confirmation Order, paragraph 14 states:

> Upon payment of all amounts due to SMCC Clubhouse under Section 4.4.1 of the Plan, **as well as the first $500,000 of the amount due to SMCC Clubhouse under Section 4.4.3** of the Plan, SMCC Clubhouse shall execute and record a release of the Judgment Lien on the Condominium Common Element. (Emphasis added)

Irrespective of which requirement governs, the bankruptcy court has erred in confirming a Plan which allows SMCC Clubhouse to hold an improper lien against the Condominium Common Element, which the Association does not legally own, for an undeterminable time, i.e. until all the Property Owners (not just condominium owners) make all payments due under Sections 4.4.1 and 4.4.3 where there is no assurance that all such payments will be made. This result not only fails to comply with the state courts' rulings, but also impairs the property rights of condominium owners.

Accordingly, the Plan is not feasible and may also constitute a violation of a condominium owner's property rights under the Fifth Amendment to the U.S. Constitution.

## CONCLUSION

Based on the foregoing, Appellants respectfully submit that the bankruptcy court erred as a matter of law in confirming the Plan. Appellants request that this Court reverse the Confirmation Order and remand the case to the bankruptcy court for further proceedings consistent with its ruling.

Dated February 27, 2020.


/s/ Shira Hedgepeth
Attorney for Appellants, Ronnie C.
Hedgepeth, Jr. and Shira Hedgepeth

/s/ Robert L. Young
Appellant, Robert L. Young,
    Pro se

/s/ Mary H. Young
Appellant, Mary H. Young,
    Pro se

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2020, I electronically filed the foregoing Notice of Appeal with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants: John R. Miller, Jr., Rayburn Cooper & Durham, P.A., 1200 Carillon, 227 W. Trade Street, Charlotte, NC 28202 and Edward Hay, Pitts, Hay & Hugenschmidt, P.A., 14 Clayton Street, Asheville, NC 28801.

/s/ Shira Hedgepeth

_____

**APPENDIX**

**Exhibit I**

CORP ID # _05/3/90_

FILED
_11:00 AM_
NOV 3 0 1999

Effective _____
ELAINE F. MARSHALL
SECRETARY OF STATE
NORTH CAROLINA

99 334 5118

ARTICLES OF INCORPORATION
OF
SMOKY MOUNTAIN COUNTRY CLUB PROPERTY OWNERS ASSOCIATION,
INC.

In compliance with the requirements of the North Carolina Planned Community
Act (Chapter 47F of the North Carolina General Statutes) and the North Carolina
Nonprofit Corporation Act (Chapter 55A of the North Carolina General Statutes), the
undersigned, as the sole incorporator, has executed these Articles of Incorporation (the
"Articles") for the purpose of forming a nonprofit corporation and hereby certifies:

ARTICLE I
NAME

The name of the corporation is "Smoky Mountain Country Club Property Owners
Association, Inc." (the "Association")

ARTICLE II
PURPOSES

The purposes of the Association shall be:

1.      To undertake and perform all acts and duties of the Association described
in the Amended And Restated Declaration Of Covenants, Conditions And Restrictions,
And Reservation of Easements For Smoky Mountain Country Club, dated October 15,
1999, (the "Declaration") relating to a planned community, known as Smoky Mountain
Country Club, on Property located in Whittier, Charleston Township, Swain County,
North Carolina. Conleys Creek Limited Partnership, a North Carolina limited partnership,
is the Declarant of the Declaration (the "Declarant").

2.      To administer the operation and management of the Association.

3.      To own, operate, manage and otherwise deal with such real and personal
property as may be necessary or convenient for the performance of the duties of the
Association under the Declaration.

        The Association shall be conducted as a nonprofit corporation for the
benefit of its members.

1

## ARTICLE III
## DEFINITIONS

The definitions of words and terms contained in the Declaration shall apply to those words and terms used in the Articles.

## ARTICLE IV
## POWERS

The Association shall have all of the powers granted to a nonprofit corporation under the laws of North Carolina pursuant to which the Association is chartered, all of the powers and duties set forth in the Declaration, and all other powers reasonably necessary to effect the purposes of the Association. The powers of the Association shall include, but not be limited to, the following:

1.      To adopt and amend bylaws and rules and regulations.

2.      To adopt and amend budgets for revenues, expenditures, and reserves, and to levy and collect assessments, including the Clubhouse Dues, against members of the Association in accordance with the terms of the Declaration.

3.      To use the proceeds of assessments for their intended purposes, including the current and timely payment of collected Clubhouse Dues to Declarant for the nonexclusive use of the Clubhouse Use Facilities by the Association and its members.

4.      To hire and discharge managing agents and other employees, agents and independent contractors.

5.      To institute, defend, or intervene in litigation or administrative proceedings on matters affecting the planned community or the Association.

6.      To make contracts, including the right to enter into contracts for:

(a)      the management, operation, and insurance coverage of the Association, and

(b)      the maintenance, repair and replacement of the Common Areas,

(c)      the maintenance, repair, replacement, and insurance coverage of the Condominium Common Element; and

(d)      the maintenance, repair and replacement of the Townhouse Common Areas.

2

7. To incur liabilities, and to borrow or lend money at such rates of interest as the Association may determine, and issue its notes, bonds and other obligations.

8. To regulate the maintenance, repair, and replacement of the Common Areas, the Townhouse Common Areas, and the Condominium Common Elements in the Property.

9. To acquire and hold in its own name the Condominium Common Element conveyed to it by Declarant, and such other real or personal property as may be acquired from time to time by the Association.

10 To encumber and convey real and personal property held in its own name; provided however, that (a) the Condominium Common Element for any Condominium Site may be conveyed or subjected to a security interest only if members, who are the Owners of all of the Condominium Units in the Condominium Site, agree in writing to that action, and (b) all other real and personal property held in its name may be conveyed or subjected to a security interest only if members entitled to cast at least eighty percent (80%) of the votes in the Association agree in writing to that action.

11. To grant easements, leases, licenses, and concessions through or over the Condominium Common Element, and such other real property as the Association may from time to time acquire.

12. To impose interest on, and to impose late charges for late payment of, assessments, including the Clubhouse Dues, during any period that assessments, including the Clubhouse Dues, or other amounts due and owing to the Association remain unpaid for a period of 30 days or longer.

13. After notice and an opportunity to be heard, to impose reasonable fines (in addition to interest and late charges) or suspend privileges or services provided by the Association (except rights of access to Lots, Townhouse Units and Condominium Units) for reasonable periods for violations of the Declaration, and the bylaws, and rules and regulations of the Association.

14. To foreclose on the lien of any assessment (together with interest, late charges and fines), including the Clubhouse Dues, against a Lot, Townhouse Unit or Condominium Unit remaining unpaid for a period of 30 days or longer.

15. To impose reasonable charges in connection with the preparation and recordation of documents, including without limitation, amendments to the Declaration or statements of unpaid assessments.

16. To provide for the indemnification of and maintain liability insurance for its officers, members of the board of directors, employees and agents.

3

17.    To delegate all of the powers and duties of the Association, including the delegation of the management and operation of the Association to Declarant for a period of time up to and including December 31, 2004.

18.    To exercise any other powers necessary and proper for the governance and operation of the Association.

ARTICLE V
MEMBERS

The Association shall have members. The qualification of members, the manner of their admission to membership, the termination of membership, and the voting by members shall be as follows:

1.    Each Owner, including Declarant, of a Lot, Townhouse Unit or Condominium Unit in the Property, and Declarant as long as Declarant owns any land in the Property shall be members of the Association, and no other persons shall be entitled to membership.

2.    An Owner shall become a member of the Association by virtue of his or her present fee ownership interest in a Lot, Townhouse Unit or Condominium Unit, or upon the future acquisition of a fee ownership interest in a Lot, Townhouse Unit or Condominium Unit, whether by conveyance, devise, judicial decree or otherwise. Declarant shall be and remain a member as long as Declarant owns any land in the Property.

The membership of an Owner (excluding Declarant) shall be automatically terminated when, and at such time as, the Owner no longer has a fee ownership interest in any Lot, Townhouse Unit or Condominium Unit. Transfer of membership shall be recognized by the Association upon the transfer of ownership, as evidenced by a certified copy of the recorded document transferring ownership, of a Lot, Townhouse Unit or Condominium to the new member.

3.    Except as appurtenant to the member's Lot, Townhouse Unit or Condominium Unit, no member may assign, hypothecate or transfer in any manner his or her membership in the Association or his or her interest in the funds and assets of the Association. The funds and assets of the Association shall belong solely to the Association, subject to the limitation that the same be expended, held or used for the benefit of the membership and for the purposes authorized in the Declaration, the Articles and in the bylaws of the Association which may be hereafter adopted or amended.

4

4. The Association shall have the following two (2) types of regular voting memberships:

(a) Class "A". The Class "A" members shall include each Owner (including Declarant) of a Lot, Townhouse Unit or Condominium Unit, and each Owner shall be entitled to one vote for each Lot, Townhouse Unit or Condominium Unit owned by such Owner.

(b) Class "B". The Class "B" member shall be Declarant, and no other person. The Class "B" membership shall exist until the earlier of (1) December 31, 2010, or (2) the date on which Declarant no longer owns any land in the Property intended by Declarant for development as a Lot, Townhouse Unit or Condominium Unit. In addition to the votes the Declarant has as a Class A member, the Declarant as a Class "B" member shall be entitled to two (2) votes for each vote held by a Class "A" member (including Declarant), plus one (1) additional vote.

Members are divided into classes for the sole purpose of computing voting rights and they shall in no event vote as a class. Fractional votes shall not be cast or counted. There shall be no right to cumulative voting on any issue, including the election of members of the board of directors of the Association.

5. If any Lot, Townhouse Unit or Condominium Unit is owned of record by multiple owners, or the Owner is an entity, the votes of such Owner shall be cast only in the following manner:

(a) If only one of the multiple owners is present at a meeting of the Association, the owner who is present is entitled to cast all of the votes allocated to the Owner of that Lot, Townhouse Unit or Condominium Unit.

(b) If more than one of the multiple owners are present, the votes allocated to the Owner of that Lot, Townhouse Unit or Condominium Unit may be cast only in accordance with the agreement of a majority in interest of the multiple owners. Majority agreement is conclusively presumed if any one of the multiple owners casts the votes allocated to the Owner of that Lot, Townhouse Unit or Condominium Unit without protest being made promptly to the person presiding over the meeting by any of the other owners of the Lot, Townhouse Unit or Condominium Unit. If a protest is promptly made by any of the other multiple owners, the votes allocated to the Owner of that Lot, Townhouse Unit or Condominium Unit shall not be cast or counted.

(c) If the Owner is an entity, the votes allocated to the Owner of that Lot, Townhouse Unit or Condominium Unit shall be cast only by a person who is, and so states that he or she is, authorized to cast the votes on behalf of such Owner.

(d) Votes allocated to an Owner of a Lot, Townhouse Unit or Condominium Unit may be cast pursuant to a proxy duly executed by the Owner. If the

5

Lot, Townhouse Unit or Condominium Unit is owned by more than one person, each person may vote or register protest to the casting of votes by the other owners through a duly executed proxy, and if contradictory votes are cast by proxy, the votes allocated to the Owner of that Lot, Townhouse Unit or Condominium Unit shall not be cast or counted. A proxy is void if it is not dated. A proxy terminates 11 months after its date, unless it specifies a shorter term.

(e) No votes allocated to a Lot, Townhouse Unit or Condominium Unit owned by the Association shall be cast or counted.

## ARTICLE VI
## TERM OF EXISTENCE

The Association is to exist perpetually, provided that the Association may be dissolved pursuant to a plan of dissolution adopted in accordance with the provisions of the North Carolina Nonprofit Corporation Act contained in Chapter 55A, Article 14, of the North Carolina General Statutes (as now exist or as may hereafter be amended) only if members entitled to cast at least eighty percent (80%) of the votes in the Association agree in writing to that action.

## ARTICLE VII
## DISTRIBUTION OF ASSETS ON DISSOLUTION

1. If the Association is dissolved under the North Carolina Nonprofit Corporation Act (Chapter 55A, Article 14, of the North Carolina General Statutes), but the planned community is not terminated, all of the assets of the Association shall be transferred to a public body or a nonprofit corporation with purposes similar to those of the Association and which agrees to undertake and perform all acts and duties of the Association described in the Declaration.

2. If the Association is dissolved, and the planned community is terminated by agreement of the Owners of Lots, Townhouse Units and Condominium Units to which at least eighty percent (80%) of the votes in the Association are allocated, the assets shall be distributed pursuant to (a) a plan of termination of the planned community adopted in accordance with the provisions the North Carolina Planned Community Act (Chapter 47F, Article 2, Section 118, of the North Carolina General Statutes) and (b) a plan of dissolution of the Association adopted in accordance with the provisions of the North Carolina Nonprofit Corporation Act (Chapter 55A, Article 14, of the North Carolina General Statutes), as now exist or as may hereafter be amended. In such event:

(a) the Condominium Common Element for each Condominium Site shall be conveyed, subject to the agreement of all of the Owners of Condominium Units therein, either to (1) the Owners of the Condominium Units on such Condominium Site, to be held thereafter in accordance with the provisions of the North Carolina Condominium Act (Chapter 47C of the North Carolina General Statutes), and each Owner of a

6

Condominium Unit shall receive an undivided interest in the Condominium Common Element equal to a percentage determined by dividing one by the total number of Condominium Units on such Condominium Site, or (2) a nonprofit corporation to be held in accordance with the provisions of the North Carolina Planned Community Act (Chapter 47F of the North Carolina General Statutes); and

(b)     all other assets, after payment of all liabilities of the Association, shall be distributed in accordance with the plan of termination of the planned community and the plan of dissolution of the Association.

ARTICLE VIII
AMENDMENTS

The Articles may be amended only in compliance with all of the following provisions:

1.     Amendments shall be proposed by the board of directors, acting upon a vote of a majority of the directors.

2.     Such proposed amendments shall become effective when approved by an affirmative vote of members owning at least 67% of the Lots, Townhouse Units and Condominium Units in the Property, unless the Articles or the Declaration require a higher percentage vote for the action encompassed by the amendment.   The members shall vote upon the proposed amendments at any regular meeting or any special meeting called for such purpose, the notice of which shall describe the amendment or amendments being proposed.   Votes may be cast in person or by written proxy or by written consent and joinder to the amendment as provided by the bylaws.

3.     No amendment of the Articles shall be made if such amendment is inconsistent with the Declaration unless the conflicting terms of the Declaration are also amended as provided in the Declaration, and any purported amendment of the Articles which is inconsistent with the terms of the Declaration shall be void.

4.     No amendment of the Articles affecting the rights, duties and obligations of Declarant in the Articles or the Declaration shall be made without the written consent of Declarant, and any purported amendment without the written consent of Declarant shall be void.

ARTICLE IX
NONPROFIT STATUS

1.     No part of the income of the Association shall be distributable to its members, directors or officers, except that the Association may pay reasonable amounts to its members for services rendered or other value received, including the Clubhouse Dues payable to Declarant, and may reimburse directors, officers and Declarant for their

7

reasonable expenses incurred in the performance of their duties on behalf of the Association.

2.    The Association shall not carry on propaganda or lobbying activities, nor otherwise act to influence legislation, nor attempt to participate or intervene in any political campaign.

## ARTICLE X
## BOARD OF DIRECTORS

1.    The Association shall be governed by a board of directors, which is the executive board of the Association, consisting of three (3) members through December 31, 2004, and five (5) members thereafter  Each member of the board of directors shall be a natural person who is an Owner, or an individual selected by an entity which is an Owner, of a Lot, Townhouse Unit or Condominium Unit in the Property.

2.    The members of the board of directors shall be selected in the following manner:

(a)  through December 31, 2004, Declarant shall have the right to appoint and remove the three (3) members of the board of directors; and

(b)  thereafter, the five (5) members of the board of directors shall be elected by a vote of the Class "A" and Class "B" members of the Association.

3.    The board of directors shall be either appointed or elected, as the case may be, at the annual membership meeting, as provided in the bylaws.  Vacancies on the board shall be filled by appointment by Declarant through December 31, 2004, and thereafter, by the remaining directors at the next duly called meeting.

4.    The Owners of the Lots, Townhouse Units and Condonimium Units, by a majority vote of all persons present and entitled to vote at any meeting of the Association at which a quorum is present, may remove any member of the board of directors with or without cause, other than a member of the board of directors appointed by Declarant.

5.    Directors shall serve without compensation, but shall be reimbursed for reasonable expenses incurred in the performance of their duties.

6.    The names and addresses of the persons who are to serve as directors until their successors are chosen are:

| Name | Address |
|---|---|
| Michael Cornblum | P.O.Box 937, Whittier, NC 28789 |
| Carolyn Cornblum | P.O.Box 937, Whittier, NC 28789 |
| Terry Setzer | P.O.Box 937, Whittier, NC 28789 |

8

## ARTICLE XI
## OFFICERS

1.      The officers who are to manage the affairs of the Association shall be a President, a Vice President, a Secretary, a Treasurer, and such other officers as deemed necessary by the board of directors, and they shall be elected by the board of directors at the annual meeting, and may be removed, with or without cause, at any time by the board of directors. Any vacancy in an office shall be filled by the board of directors.

2.      The officers shall serve without compensation, but shall be reimbursed for reasonable expenses incurred in the performance of their duties.

3.      The board of directors may, at such time as is deemed feasible, hire a general manager, who shall be entitled to reasonable compensation, to run the day to day operation of the Association.

## ARTICLE XII
## INDEMNITY

Every director and every officer of the Association, and Declarant in the management of the Association up through December 31, 2004, shall, to the maximum extent permitted by law, be indemnified by the Association against all expenses and liabilities, including attorney's fees, reasonably incurred by or imposed in connection with any business of the Association or any proceeding to which such person or Declarant may be a party by reason of being or having been a director, officer or in charge of the management of the Association, whether or not such person is a director or officer, or Declarant is in charge of the management of the Association, at the time such expenses and liabilities are incurred, except in such cases where the director, officer or Declarant is adjudged by a court of competent jurisdiction to be guilty of willful misconduct in the performance of their duties.

## ARTICLE XIII
## BY-LAWS

1.      The board of directors of the Association shall provide such bylaws for the conduct of its business and the carrying out of its purpose as it may deem necessary from time to time.

2.      The bylaws may be amended, altered or rescinded upon the proposal of a majority of the board of directors and approval in person or by proxy of the members of the Association holding a majority of votes present at the regular or special meeting of the members, the notice of which shall state that such proposal is to be voted upon at the meeting or may be amended by the written consent and joinder of the members as provided in the bylaws.

9

3.   The bylaws shall not be inconsistent with the Declaration or the Articles.

ARTICLE XIV
LOCATION

The principal office of the Association shall be located at 1112 Conleys Creek Road, Whittier, NC 28789, or wherever the board of directors shall determine from time to time.

ARTICLE XV
INCORPORATOR

The name and address of the sole incorporator of the Association are:

Michael Cornblum
P.O.Box 937
Whittier, NC 28789

ARTICLE XVI
REGISTERED OFFICE AND REGISTERED AGENT

The registered office of the Association is in Swain County, North Carolina. The street address of the registered office is 1112 Conleys Creek Road, Whittier, NC 28789, and the mailing address of the registered office is P.O.Box 937, Whittier, NC 28789. The registered agent of the Association at those addresses is Michael Cornblum.

IN WITNESS WHEREOF, the undersigned incorporator has hereunto set his hand and seal this 29th day of October, 1999.

_Michael Cornblum_   (SEAL)
Michael Cornblum
Incorporator

STATE OF NORTH CAROLINA
COUNTY OF JACKSON

I, Brenda D. Mixon, a Notary Public, do hereby certify that Michael Cornblum personally came before me this day and acknowledged that he signed the Articles of Incorporation of Smoky Mountain Country Club Property Owners Association, Inc.

Witness my hand and notarial seal this 29th day of October, 1999.

_Brenda D Mixon_
Notary Public

My Commission Expires: 01/24/2004

10

**Exhibit II**

# BY-LAWS OF
## SMOKY MOUNTAIN COUNTRY CLUB PROPERTY OWNERS ASSOCATION, INC.,
### a North Carolina Nonprofit Corporation

## ARTICLE I
### Name, Definitions, Purposes

**1.1**    **Name.**    The name of this association shall be Smoky Mountain Country Club Property Owners Association, Inc.

**1.2**    **Definitions.**

**1.21**   **"Association"** shall mean and refer to Smoky Mountain Club Property Owners Association, Inc., a North Carolina nonprofit corporation, incorporated under the North Carolina Nonprofit Corporation Act (Chapter 55A of the North Carolina General Statutes).

**1.22**   **"Articles"** shall mean and refer to the Articles of Incorporation of the Association filed with the North Carolina Department of the Secretary of State on November 30, 1999, as the same may be amended from time to time in accordance with the provisions of the Declaration, the Articles, and the applicable law.

**1.23**   **"By-Laws"** shall mean and refer to these By-Laws of the Association, as the same may be amended from time to time in accordance with the provisions of the Declaration, the Articles, the By-Laws, and the applicable law.

**1.24**   **"Declarant"** shall mean and refer to Conleys Creek Limited Partnership, a North Carolina limited partnership.

**1.25**   **"Declaration"** shall mean and refer to the Amended and Restated Declaration of Covenants, Conditions and Restrictions, and Reservation of Easements for Smoky Mountain Country Club, dated October 15, 1999, and recorded November 23, 1999, in Book 229, Page 919, Public Registry of Swain County, North Carolina, as the same may be amended from time to time in accordance with the provisions thereof, and the applicable law.

**1.3**    **Applicable Definitions/Interpretation.**

**1.31**   The Declaration and the Articles are incorporated herein by reference.

**1.32**   The definitions of words and terms contained in the Declaration shall apply to those words and terms used in the Articles and By-Laws.

1

**1.33** The By-Laws shall not be construed, interpreted or implemented in any manner inconsistent with the Declaration and the Articles.

**1.4** **Purposes.** The purposes of the Association shall be:

**1.41** To undertake and perform all acts and duties of the Association described in the Declaration relating to a planned community, known as Smoky Mountain Country Club, on Property located in Whittier, Charleston Township, Swain County, North Carolina.

**1.42** To administer the operation and management of the Association.

**1.43** To own, operate, manage and otherwise deal with such real and personal property as may be necessary or convenient for the performance of the duties of the Association under the Declaration.

The Association shall be conducted as a nonprofit corporation for the benefit of its members.

### ARTICLE II
### Offices, Registered Agent, Seal, Fiscal Year

**2.1** **Principal Office, Registered Office.** The principal office and the registered office of the Association shall be located at 1112 Conleys Creek Road, Whittier, Swain County, North Carolina, and the mailing address is P.O. Box 937, Whittier, NC 28789. The location and/or mailing address of the principal office and/or the registered office of the Association may be changed by a majority vote of the Board of Directors.

**2.2** **Registered Agent.** The initial Registered Agent for the Association is Michael Cornblum, 1112 Conleys Creek Road, Whittier, North Carolina, 28789. The individual serving as Registered Agent may be removed from office and replaced at any time by a vote of the Board of Directors of the Association.

**2.3** **Other Offices.** The Association may have other offices at such other places within Swain County, North Carolina, as the Board of Directors may from time to time determine or as the affairs of the Association may require.

**2.4** **Seal.** The seal of the Association shall contain the name of the Association, the word "Seal", and such other words and figures as described by the Board of Directors. When obtained, the seal shall be impressed in the margin of the minutes of the initial meeting of the Board of Directors.

**2.5** **Fiscal Year.** The fiscal year of the Association shall be a calendar year.

2

# ARTICLE III
## Membership, Voting

**3.1** <u>Qualification, Admission, Termination</u>. The Association shall have members. The qualification of members, the manner of their admission to membership, and the termination of membership shall be as follows:

**3.11** Each Owner, including Declarant, of a Lot, Townhouse Unit or Condominium Unit in the Property, and Declarant as long as Declarant owns any land in the Property shall be Members of the Association, and no other persons shall be entitled to membership.

**3.12** An Owner shall become a Member of the Association by virtue of his or her present fee ownership interest in a Lot, Townhouse Unit or Condominium Unit, or upon the future acquisition of a fee ownership interest in a Lot, Townhouse Unit or Condominium Unit, whether by conveyance, devise, judicial decree or otherwise. Declarant shall be and remain a Member as long as Declarant owns any land in the Property.

**3.13** The membership of an Owner (excluding Declarant) shall be automatically terminated when, and at such time as, the Owner no longer has a fee ownership interest in any Lot, Townhouse Unit or Condominium Unit. Transfer of membership shall be recognized by the Association upon the transfer of ownership, as evidenced by a certified copy of the recorded document transferring ownership, of a Lot, Townhouse Unit or Condominium to the new member.

**3.14** Except as appurtenant to the member's Lot, Townhouse Unit or Condominium Unit, no Member may assign, hypothecate or transfer in any manner his or her membership in the Association or his or her interest in the funds and assets of the Association. The funds and assets of the Association shall belong solely to the Association, subject to the limitation that the same be expended, held or used for the benefit of the membership and for the purposes authorized in the Declaration, the Articles and in the By-Laws.

**3.2** <u>Voting</u>. The Association shall have the following two (2) types of regular voting memberships:

**3.21** Class "A". The Class "A" Members shall include each Owner (including Declarant) of a Lot, Townhouse Unit or Condominium Unit, and each Owner shall be entitled to one vote for each Lot, Townhouse Unit or Condominium Unit owned by such Owner.

**3.22** Class "B". The Class "B" Member shall be Declarant, and no other person. The Class "B" membership shall exist until the earlier of (1) December 31, 2010, or (2) the date on which Declarant no longer owns any land in the Property intended

3

by Declarant for development as a Lot, Townhouse Unit or Condominium Unit. In addition to the votes the Declarant has as a Class A Member, the Declarant as a Class "B" member shall be entitled to two (2) votes for each vote held by a Class "A" Member (including Declarant), plus one (1) additional vote.

      **3.23**    Members are divided into classes for the sole purpose of computing voting rights and they shall in no event vote as a class. Fractional votes shall not be cast or counted. There shall be no right to cumulative voting on any issue, including the election of members of the Board of Directors of the Association.

      **3.3**    <u>Multiple Owners, Entity Voting, Proxies.</u> If any Lot, Townhouse Unit or Condominium Unit is owned of record by multiple owners, or the Owner is an entity, the votes of such Owner shall be cast only in the following manner:

      **3.31**    If only one of the multiple owners is present at a meeting of the Association, the owner who is present is entitled to cast all of the votes allocated to the Owner of that Lot, Townhouse Unit or Condominium Unit.

      **3.32**    If more than one of the multiple owners are present, the votes allocated to the Owner of that Lot, Townhouse Unit or Condominium Unit may be cast only in accordance with the agreement of a majority in interest of the multiple owners. Majority agreement is conclusively presumed if any one of the multiple owners casts the votes allocated to the Owner of that Lot, Townhouse Unit or Condominium Unit without protest being made promptly to the person presiding over the meeting by any of the other owners of the Lot, Townhouse Unit or Condominium Unit. If a protest is promptly made by any of the other multiple owners, the votes allocated to the Owner of that Lot, Townhouse Unit or Condominium Unit shall not be cast or counted.

      **3.33**    If the Owner is an entity, the votes allocated to the Owner of that Lot, Townhouse Unit or Condominium Unit shall be cast only by a person who is, and so states that he or she is, authorized to cast the votes on behalf of such Owner.

      **3.34**    Votes allocated to an Owner of a Lot, Townhouse Unit or Condominium Unit may be cast pursuant to a proxy duly executed by the Owner. If the Lot, Townhouse Unit or Condominium Unit is owned by more than one person, each person may vote or register protest to the casting of votes by the other owners through a duly executed proxy, and if contradictory votes are cast by proxy, the votes allocated to the Owner of that Lot, Townhouse Unit or Condominium Unit shall not be cast or counted. A proxy is void if it is not dated. A proxy terminates 11 months after its date, unless it specifies a shorter term.

      **3.35**    No votes allocated to a Lot, Townhouse Unit or Condominium Unit owned by the Association shall be cast or counted.

## ARTICLE IV
## Membership Meetings

**4.1     Annual Meetings.**     The first Annual Meeting shall be a Substitute Annual Meeting called by the Board of Directors within the year 2000, and thereafter, the Annual Meeting of the Members shall be held on the first Saturday of March each year beginning in 2001 at the place in Swain County, North Carolina, designated by the Board of Directors.

**4.2     Substitute Annual Meetings.**     If an Annual Meeting shall not be held on the day designated by the By-Laws, a substitute Annual Meeting may be called in accordance with the provisions of Sections 4.3 and 4.4 of the By-Laws.  A meeting so called shall be designated and treated for all purposes as the Annual Meeting.

**4.3     Special Meetings.**     After the first Annual Meeting of the Members, Special Meetings of the Members may be called at any time by the President, a majority of the Board of Directors, or pursuant to the written request of the Owners of not less than ten (10%) percent of the votes of the Membership, by written notice to all Members. Business to be acted upon at all Special Meetings shall be confined to the objects stated in the notice of such meeting.  All meetings shall be held in Swain County, North Carolina.

**4.4     Notices of Meetings, Waiver.**     Written notice stating the time and place of the Special Meeting shall be delivered not less than ten (10) nor more than fifty (50) days in advance of the date of Special Meeting, either hand-delivered or sent prepaid by United States mail by or at the direction of the President, the Secretary or other person calling the Special Meeting, to each Member entitled to vote at such Special Meeting. Notice shall be deemed given upon the date of personal service or deposit in an official depository of the United States Postal Service in an envelope properly addressed to each Member at the address of such Member's Lot, Condominium Unit or Townhouse Unit, or at any other address given in writing to the Association by the Member, with sufficient postage affixed thereto.  In the case of a Special Meeting, the notice of meeting shall state the time and place of the meeting and the items on the agenda, including the general nature of any proposed amendment to the Declaration of By-Laws, any budget changes, and any proposal to remove a director or officer; however, in the case of an Annual or Substitute Annual Meeting, the notice of meeting need not state specifically the business to be transacted thereat.  Any Member may waive the necessity of formal notice to him by signing a written waiver either before or after the meeting, and upon execution of such waiver the Member shall not be entitled thereafter to object to the meeting because of lack of notice thereof.

**4.5     Quorum.**  A quorum is present throughout any Annual Meeting or Special Meeting of the Association if Members entitled to cast fifty percent (50%) of the votes (both Class A and Class B) for the election of the Board of Directors are present in person or by proxy at the beginning of the meeting.  In the event business cannot be conducted at any Annual Meeting or Special Meeting because a quorum is not present, that meeting

5

may be adjourned to a later date by the affirmative vote of a majority of those present in person or by proxy. Notwithstanding any provision to the contrary in the Declaration or the By-Laws, the quorum requirement at the next meeting shall be one-half of the quorum requirement applicable to the meeting adjourned for lack of a quorum. This provision shall continue to reduce the quorum by fifty percent (50%) from that required at the previous meeting, as previously reduced, until such time as a quorum is present and business can be conducted.

**4.6     Duty of Members to Inform Association of Current Address.**     Each Member shall have the affirmation duty and obligation to inform the Association in writing of any change of ownership of the Member's Lot, Condominium Unit or Townhouse Unit, the Member's current address, and any failure of the Member to receive any information from the Association at the correct address of the Member. No Member shall be excused from his, her or its obligations established in the Declaration, the Articles or the By-Laws nor challenge any assessment or any action taken at any Annual Meeting or Special Meeting if the Association mailed the notice of the meeting or the assessment bill to the last address of said Member which is recorded on the books of the Association and for which the Association has not received the Member's current address or notice of change of ownership from the Member.

**4.7     Majority Vote.**     The casting of a majority of the votes (both Class A and Class B) represented at a meeting at which a quorum is present, in person or by proxy, shall be binding for all purposes except where a higher percentage vote is required by the Declaration, the Articles, the By-Laws or by law.

**4.8     Actions without Meeting.**     Any action which may be taken at an Annual Meeting or Special Meeting of the Association may be taken without a meeting if a consent or ratification, in writing, setting forth the action so taken or to be taken shall be signed by persons who would be entitled to vote upon such action at a meeting and such consent is filed with the Secretary of the Association and inserted in the minute book of the Association.

**ARTICLE V**
**Board of Directors**

**5.1     General Powers.**     The Association shall be governed by a Board of Directors, which is the executive board of the Association. The business and affairs of the Association shall be managed by the Board of Directors or by such committees as the Board may establish pursuant to Article VI of the By-Laws.

**5.2     Number and Qualifications.**     The Board of Directors shall consist of three (3) members through December 31, 2004, and five (5) members thereafter. Each member of the Board of Directors shall be a natural person who is an Owner, or an individual selected by an entity which is an Owner, of a Lot, Townhouse Unit or Condominium Unit in the Property. Each member of the Board of Directors shall be at

6

least eighteen (18) years of age. Any qualified Director may be re-appointed or re-elected in office. Each Director shall hold office until his or her death, resignation, retirement, removal, disqualification or his or her successor is elected and qualified.

**5.3     Appointment of Directors.**  Up through December 31, 2004, Declarant shall have the sole right to appoint and remove the three members of the Board of Directors. The initial Board of Directors shall consist of the three (3) individuals named in the Articles. The initial members of the Board of Directors shall serve until either they or their successors are appointed by Declarant at the first Annual Meeting.

**5.4     Election of Directors.**  From and after January 1, 2005, the five (5) members of the Board of Directors shall be elected by a vote of the Class "A" and Class "B" Members of the Association. The term for each Director shall be one (1) year.  All Directors shall serve until their successors are elected and qualified.  If any Member so demands or if the presiding officer so directs, the election of Directors shall be by ballot. Otherwise, the election shall be by voice vote.  The five (5) qualified individuals receiving the highest number of votes (both Class A and Class B) at an Annual Meeting or Substitute Annual Meeting at which a quorum is present shall be elected as Directors.

**5.5     Nominations.**    Nominations for election to the Board of Directors shall be made by a Nominating Committee consisting of a Chairman, who shall be a member of the Board of Directors, and at least two (2) Members of the Association.  The Nominating Committee shall be appointed by the Board of Directors prior to each Annual Meeting to serve from the close of such Annual Meeting until the close of the next Annual Meeting, and such appointment shall be announced at each Annual Meeting. The Nominating Committee shall make as many nominations for election to the Board of Directors as it shall, in its discretion, determine; however, in no event shall the nominations be less than the number of vacancies.  Nominations may be made also from the floor at the Annual Membership Meeting.

**5.6     Vacancies.**    A vacancy occurring in the Board of Directors from and after January 1, 2005, may be filled by a majority of the remaining Directors, though less than a quorum, or by the sole remaining Director; however, a vacancy created by an increase in the authorized number of Directors shall be filled only by election at an Annual or Substitute Annual Meeting, or at a Special Meeting of Members called for that purpose, or by unanimous consent of the Members without meeting.  From and after January 1, 2005, the Members may vote to elect a Director at any time to fill any vacancy not filled by the Directors.

**5.7     Removal.** The Owners of the Lots, Townhouse Units and Condonimium Units, by a majority vote of all persons present and entitled to vote at any meeting of the Association at which a quorum is present, may remove any member of the Board of Directors with or without cause, other than a member of the Board of Directors appointed by Declarant. If any Directors are so removed, their successors as Directors may be

7

elected by the Members at the same meeting to fill the unexpired terms of the Directors so removed.

**5.8** **Chairman.** There may be a Chairman of the Board elected by the Directors from their number at any meeting of the Board of Directors. The Chairman shall preside at all meetings of the Board of Directors and perform such other duties as may be directed by the Board. In the absence of the Chairman, the President shall preside at all meetings of the Board of Directors.

**5.9** **No Compensation.** No member of the Board of Directors shall receive any compensation from the Association for acting as such; provided, however, each Director, upon approval of the Board, shall be reimbursed for reasonable out-of-pocket expenses incurred and paid by him or her on behalf of the Association, and nothing herein shall prohibit the Board compensating a Director for unusual and extraordinary services rendered; further provided, each Director, by assuming office, waives his or her right to institute suit against or make claim upon the Association for compensation.

**5.10** **Loans to Directors and Officers.** No loans shall be made by the Association to its Directors or Officers.

**5.11** **Liability of Directors.** The liability and indemnification of the Directors is addressed in Article XII of the Articles. To the extent permitted by law, each Director shall be indemnified by the Association with respect to any liability and expense of litigation arising out of his or her lawful activities within the scope of his or her duties as a Director.

**5.12** **Meetings of the Board of Directors.**

**5.121** Regular Meetings. Regular meetings of the Board of Directors shall be held, without notice, at such hour and address as may be fixed from time to time by resolution of the Board. Should any such meeting fall upon a legal holiday, then that meeting shall be held at the same time on the next day which is not a legal holiday.

**5.122** Special Meetings. Special meetings of the Board of Directors shall be held when called by the President of the Association or by any Director after not less than three (3) nor more than thirty (30) days written notice to each Director.

**5.123** Notices of Special Meetings. The notice provided for herein may be waived by written instrument signed by those Directors who do not receive such notice. Except to the extent otherwise required by law, the purpose of a Directors' Special Meeting need not be stated in the notice. Attendance by a Director at a meeting shall constitute a waiver of notice of such meeting unless such Director gives written statement at the meeting to the person presiding, objecting to the transaction of any business because the meeting is not called lawfully.

8

**5.124** <u>Approved Meeting Place</u>.　　All meetings of the Board of Directors shall be held in the County of Swain, State of North Carolina, unless a majority of the Directors then in office agree in writing to hold a meeting or meetings at another location.

**5.125** <u>Quorum</u>.　　A majority of the Directors then holding office shall constitute a quorum for the transaction of business and every act or decision done or made by a majority of the Directors present at a duly held meeting at which a quorum is present shall be regarded as the act or decision of the Board of Directors. In the event business cannot be conducted at any meeting of the Board of Directors because a quorum is not present, that meeting may be adjourned to a later date by the affirmative vote of a majority of those present in person.　　Notwithstanding any provision to the contrary in the Declaration or the By-Laws, the quorum requirement at the next meeting shall be one-half of the quorum requirement applicable to the meeting adjourned for lack of a quorum. This provision shall continue to reduce the quorum by fifty percent (50%) from that required at the previous meeting, as previously reduced, until such time as a quorum is present and business can be conducted.

**5.13**　**<u>Action without Meeting</u>.**　　The Directors shall have the right to take any action in the absence of a meeting which they could take at a meeting by obtaining the written approval of all of the Directors. Any action so approved shall have the same effect as if taken at a meeting of the Board of Directors. Such written approval shall be filed with the minutes of the proceedings of the Board of Directors, whether done before or after the action so taken.

**5.14**　**<u>Presumption of Assent</u>.**　　A Director who is present at a meeting of the Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless his contrary vote is recorded or his dissent otherwise is entered in the minutes of the meeting, or unless he shall file his written dissent to such action with the person acting as Secretary of the meeting before the adjournment thereof, or shall forward such dissent by registered mail to the Secretary of the Association immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favor of such action.

**5.15**　**<u>Powers and Duties</u>.**　　The Board of Directors shall have all of the powers and duties necessary for the administration of the affairs of the Association, except such powers and duties as by law, the Declaration, or the Articles may not be delegated to the Board of Directors. The powers and duties to be exercised by the Board of Directors on behalf of the Association shall include, but shall not be limited to, the following:

(a) To adopt the By-Laws, propose amendments thereto, and to adopt and amend rules and regulations for the operation of the Association..

9

(b) To adopt and amend budgets for revenues, expenditures, and reserves, and to levy and collect assessments, including the Clubhouse Dues, against Members of the Association in accordance with the terms of the Declaration.

(c) To use the proceeds of assessments for their intended purposes, including the current and timely payment of collected Clubhouse Dues to Declarant for the nonexclusive use of the Clubhouse Use Facilities by the Association and its Members.

(d) To hire and discharge managing agents and other employees, agents and independent contractors.

(e) To institute, defend, or intervene in litigation or administrative proceedings on matters affecting the planned community or the Association.

(f) To make contracts, including the right to enter into contracts for:

(1) the management, operation, and insurance coverage of the Association, and

(2) the maintenance, repair and replacement of the Common Areas,

(3) the maintenance, repair, replacement, and insurance coverage of the Condominium Common Element; and

(4) the maintenance, repair and replacement of the Townhouse Common Areas.

(g) To incur liabilities, and to borrow or lend money at such rates of interest as the Association may determine, and issue its notes, bonds and other obligations.

(h) To regulate the maintenance, repair, and replacement of the Common Areas, the Townhouse Common Areas, and the Condominium Common Elements in the Property.

(i) To acquire and hold in the Association's name the Condominium Common Element conveyed to it by Declarant, and such other real or personal property as may be acquired from time to time by the Association.

(j) To encumber and convey real and personal property held in the Association's name; provided however, that (a) the Condominium Common Element for any Condominium Site may be conveyed or subjected to a security interest only if Members, who are the Owners of all of the Condominium Units in the Condominium Site, agree in writing to that action, and (b) all other real and personal property held in the Association's name may be conveyed or subjected to a security interest only if Members

10

entitled to cast at least eighty percent (80%) of the votes in the Association agree in writing to that action.

(k) To grant easements, leases, licenses, and concessions through or over the Condominium Common Element, and such other real property as the Association may from time to time acquire.

(l) To impose interest on, and to impose late charges for late payment of, assessments, including the Clubhouse Dues, during any period that assessments, including the Clubhouse Dues, or other amounts due and owing to the Association remain unpaid for a period of 30 days or longer.

(m) After notice and an opportunity to be heard, to impose reasonable fines (in addition to interest and late charges) or suspend privileges or services provided by the Association (except rights of access to Lots, Townhouse Units and Condominium Units) for reasonable periods for violations of the Declaration, and the By-Laws, and rules and regulations of the Association.

(n) To foreclose on the lien of any assessment (together with interest, late charges and fines), including the Clubhouse Dues, against a Lot, Townhouse Unit or Condominium Unit remaining unpaid for a period of 30 days or longer.

(o) To impose reasonable charges in connection with the preparation and recordation of documents, including without limitation, amendments to the Declaration or statements of unpaid assessments.

(p) To provide for the indemnification of and maintain liability insurance for the officers, members of the Board of Directors, employees and agents of the Association.

(q) To delegate all of the powers and duties of the Association, including the delegation of the management and operation of the Association to Declarant for a period of time up to and including December 31, 2004.

(r) To exercise any other powers necessary and proper for the governance and operation of the Association, including but not limited to:

(1) opening of bank accounts on behalf of the Association and designating the signatories required therefor; and

(2) supervising all officers, agents and employees of the Association and insuring that their duties are properly performed.

11

**5.16    Independent Manager.**    The Board of Directors may employ or enter into a management contract with any individual or firm it deems appropriate and in the best interest of the Association concerning the routine duties of the Association under the Declaration concerning the Property.    The Board shall delegate to such person or firm (herein referred to in the By-Laws as "Independent Manager") such duties and responsibilities in the maintenance and repair of the Property as the Board deems appropriate.    Nevertheless, the Board may not delegate to the Independent Manager the complete and total responsibilities and duties of the Association in violation of the Declaration or any law.    The Board shall have authority to fix reasonable compensation for the Independent Manager.    The Independent Manager shall at all times be answerable to the Board of Directors and subject to its direction.    Provided, however, if said management contract is entered into prior to the passage of control of the Association from Declarant, the Association shall not be bound either directly or indirectly unless there is a right of termination of such management contract without cause, which is exercisable without penalty at any time after the transfer of control upon not more than ninety (90) days notice to the other party.

## ARTICLE VI
### Committees

**6.1    Creation.**    The Board of Directors, by resolutions adopted by a majority of the number of Directors then holding office, may create such committees as it deems necessary and appropriate in aiding the Board to carry out its duties and responsibilities under the Declaration.    Each committee so created shall have such authority and responsibility as the Board deems appropriate *and as set forth in the resolutions creating* such committee.    The Board shall elect the members of such committee.    Each committee shall have in its membership at least one (1) member of the Board of Directors.

**6.2    Vacancy.**    Any vacancy occurring on a committee shall be filled by a majority of the number of Directors then holding office at a regular or special meeting of the Board.

**6.3    Removal.**    Any member of a committee may be removed at any time with or without cause by a majority of the number of Directors then holding office.

**6.4    Minutes.**    Each committee shall keep regular minutes of its proceedings and report the same to the Board of Directors when required.

**6.5    Responsibility of Directors.**    The designation of committees and the delegation thereto of authority shall not operate to relieve the Board or any member thereof of any responsibility or liability imposed upon it by law.    If action taken by a committee is not considered formally thereafter by the Board, a Director may dissent from such action by filling his written objection with the Secretary with reasonable promptness after learning of such action.

12

# ARTICLE VII
## Officers

**7.1** **Enumeration of Officers.** The officers of the Association shall consist of a President, Vice President, Secretary, Treasurer and such Assistant Secretaries, Assistant Treasurers and other officers that the Board may from time to time deem appropriate. No officer need be an Owner or a member of the Board of Directors.

**7.2** **Election and Term.** The officers of the Association shall be elected annually by the Board of Directors. Such elections shall be held at the first meeting of the Board next following the Annual Meeting or Substitute Annual Meeting of the Association. Each officer shall hold office until death, resignation, removal or until a successor is elected and qualified.

**7.3** **Removal.** Any officer elected or appointed by the Board may be removed by the Board whenever in its judgment the best interest of the Association will be served thereby.

**7.4** **Vacancy.** A vacancy in any office may be filled by the election by the Board of a successor to such office. Such election may be held at any meeting of the Board. The officer elected to such vacancy shall serve for the remaining term of the officer he or she replaced.

**7.5** **Multiple Offices.** From and after January 1, 2005, the person holding the office of President shall not also hold the offices of Secretary or Treasurer at the same time. Except as set forth above, any offices may be simultaneously held by one person.

**7.6** **President.** The President shall be the chief executive officer of the Association and shall be the Chairman of The Board of Directors, if no other member of the Board be so designated, and shall preside at all meetings of the Members. In the absence of an elected Chairman, the President shall preside also at all meetings of the Board. The President shall see that the orders and resolutions of the Board of Directors are carried out; shall sign on behalf of the Association all written instruments regarding the Property and all promissory notes of the Association, if any. The President shall have all powers necessary as the person responsible to carry out and perform actions of the Board of Directors or to execute authority given him or her by the Board.

**7.7** **Vice President.** The Vice Presidents, in order of their election unless otherwise determined by the Board, in the absence or disability of the President, shall perform the duties and exercise the powers of that office. In addition, they shall perform such other duties and have such other powers, as the Board shall prescribe.

**7.8** **Secretary.** The Secretary shall keep the minutes of all meetings of Members and of the Board; shall have charge of such books and papers as the Board may direct; and shall perform all duties and have such powers as the Board shall prescribe.

13

**7.9    Treasurer.**    The Treasurer shall have the responsibility for keeping full and accurate financial records in books of account showing all receipts and disbursements, and for the preparation of all required financial statements.  Beginning in 2000, he shall cause an annual financial statement to be prepared at the completion of each fiscal year, prepare or cause to be prepared an annual budget and a statement of income and expenditures to be presented to the Members at the Annual Meeting, and deliver a copy of each to the Members.  He shall perform all duties and have such powers, as the Board shall prescribe.

**7.10    Assistant Secretaries and Treasurers.**    The Assistant Secretaries and Treasurers shall, in the absence or disability of the Secretary or the Treasurer, respectively, perform the duties and exercise the powers of those offices, and they shall, in general, perform such other duties as shall be assigned to them by the Secretary or the Treasurer, respectively, or by the President or by the Board.

**7.11    No Compensation.**    No officer shall receive any compensation from the Association for acting as such; provided, however, each officer, upon approval of the Board of Directors, shall be reimbursed for reasonable out-of-pocket expenses incurred and paid by him or her on behalf of the Association, and nothing herein shall prohibit the Board compensating an officer for unusual and extraordinary services rendered; further provided, each officer, by assuming office, waives his or her right to institute suit against or make claim upon the Association for compensation.

**7.11    Executing Documents.**    The President and Secretary may prepare, execute, certify, and record amendments to the Declaration on behalf of the Association.

## ARTICLE VIII
### General Provisions

**8.1    Parliamentary Rules.**    Robert's Rules of Order (latest edition) shall govern the conduct of the Association proceedings when not in conflict with North Carolina law, the Declaration or the By-Laws.

**8.2    Fidelity Bonds.**    The Board of Directors, on behalf of the Association, may require that all employees of the Association or Independent Manager handling or responsible for Association funds furnish adequate fidelity bonds.  The premium on such bonds shall be paid by the Association.

**8.3    Amendments.**    The By-Laws may be amended by the majority vote (Class A and Class B) of the Members; provided, however, if a larger vote is required to take or refrain from taking a specific action, as set forth in the Declaration, the Articles or the By-Laws, no amendment shall be made unless and until the such larger percentage of Members approve thereof.  All persons or entities who own or hereafter acquire any

14

interest in the Property shall be bound to abide by any amendment to these By-Laws, upon the same being passed as provided herein.

Adopted and effective as of December 15, 1999.

*Michael Cornblum*
Michael Cornblum, President

Attest: *Carolyn Cornblum*
Carolyn Cornblum, Secretary

15

First Amendment

By-Laws Of
Smoky Mountain Country Club Property Owners Association, Inc.,
A North Carolina Nonprofit Corporation

Paragraph 4.1 of the By-Laws is amended to read as follows:

    4.1    **<u>Annual Meetings</u>**.    The Annual Meeting of the Members shall be held on the fourth Saturday of May each year, beginning in 2009, at the place in Swain County, North Carolina, designated by the Board of Directors.

Adopted by majority vote (Class A and Class B) of the Members of the Association at the Ninth Annual Meeting held on May 24, 2008.

**Exhibit III**

STATE OF NORTH CAROLINA    IN THE GENERAL COURT OF JUSTICE
                                                SUPERIOR COURT DIVISION
COUNTY OF SWAIN         2019 MAY -2  A  8: 52  14 CVS 238

SWAIN CO., C.S.C.
BY

CONLEYS CREEK LIMITED
PARTNERSHIP, a North Carolina
Limited partnership, and MARSHALL
CORNBLUM,

        *Plaintiffs and Counterclaim*
        *Defendants,*

        AND                    PARTIAL JUDGMENT ON
                                   CONDOMINIUM ISSUE

MICHAEL CORNBLUM MADELINE
CORNBLUM M&D CREEK, INC., a
North Carolina Corporation,
CORNDERMAY PARTNERS, by and
Through its general partners, M&D CREEK,
INC., and other unknown partners,

        *Counterclaim Defendants,*

        AND

SMCC CLUBHOUSE, LLC, a North Carolina
Limited liability Company,

        *Counterclaimant,*

        v.

SMOKY MOUNTAIN COUNTRY CLUB
PROPERTY OWNERS' ASSOCIATIION, INC.,
a North Carolina nonprofit corporation,

        *Defendant, Counterclaimant,*



A TRUE COPY
SWAIN COUNTY
CLERK SUPERIOR COURT
BY _____ ASSISTANT

AND

WILLIAM SPUTE, RONALD SHULMAN,
And CLAUDETTE KRIZEK,

>*Defendants, Counterclaim*
>*Defendants,*

AND

ROBERT YOUNG,

>*Counterclaim Defendant.*

THIS MATTER coming before the Superior Court of Swain County, sitting

in Macon County on 27 April 2018 pursuant to the mandate of the North Carolina

Court of Appeals contained in its revised opinion dated 5 September 2017. That

opinion directed this court to enter judgment in favor of Smoky Mountain Country

Club Property Owners' Association, Inc. on the First Counterclaim for Declaratory

Judgment in its Third Amended Counterclaims "declaring that the 1999

Declaration establishes a form of property ownership in the Planned Community's

condo units not recognized in North Carolina." The Court of Appeals defined

"condo units" in accordance with the provisions of Comment 2 of N.C. Gen. Stat.

47F-1-101 as having "horizontal boundaries or divisions between the physical

portions of the planned community designated for separate ownership or

occupancy. . ."

2

The opinion further stated the judgment "would not affect the rights of those not parties to this action."

IT IS ORDERED, ADJUDGED, and DECREED:

1.    Judgment is hereby entered in favor of Smoky Mountain Country Club Property Owners' Association, Inc. on the First Counterclaim for Declaratory Judgment in its Third Amended Counterclaims declaring that the 1999 Declaration establishes a form of property ownership in the Planned Community's condo units not recognized in North Carolina.

2.    This judgment shall not affect the rights of those not parties to this action.

This 27th day of April, 2018.

Judge Presiding

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that he served a copy of the foregoing or Partial Judgment on Condominium Issue on the following persons by depositing a copy in the United States mail, postage prepaid, and properly addressed as follows:

James W. Kilbourne, Jr.
Dungan, Kilbourne & Stahl, P.A.
One Rankin Avenue
Third Floor
Asheville, NC 28801

William C. Robinson
Robinson, Elliott & Smith
P.O. Box 36098
Charlotte, NC 28236

This the 27 day of April, 2018.

James U. Downs, NCSB #1231
P.O. Box 879
Franklin, NC 28744
Telephone: (828) 524-6414

4

**Certificate of Service**

I hereby certify that on February 27, 2020, I electronically filed the foregoing Brief of Appellants Ronnie C. Hedgepeth, Jr., Shira Hedgepeth, Robert L. Young and Mary H. Young with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants: John R. Miller, Jr., Rayburn Cooper & Durham, P.A., 1200 Carillon, 227 W. Trade Street, Charlotte, NC 28202; Edward Hay, Pitts, Hay & Hugenschmidt, P.A., 14 Clayton Street, Asheville, NC 28801; and Shelley K. Abel, US Bankruptcy Administrator, 402 Trade Street, Charlotte, NC 28202.

/s/ Shira Hedgepeth